AUSA:     Danielle Asher          Telephone:  (313) 226-9518
AO 106 (Rev. 04/10)  Application for a Search Warrant   Special Agent:   Todd Monfette, ATF   Telephone:  (313) 600-1240

# UNITED STATES DISTRICT COURT
for the
Eastern District of Michigan

In the Matter of the Search of                   )
*(Briefly describe the property to be searched*    )
*or identify the person by name and address)*      )        Case No.  18-50629-67
                                                 )
72 Orchard Street, Mount Clemens, MI 48043       )
(More details in Attachment A)                   )
                                                 )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See ATTACHMENT A

located in the _____Eastern_____ District of _____Michigan_____ , there is now concealed *(identify the person or describe the property to be seized):*

See ATTACHMENT B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1); 846 | Conspiracy to Possess with Intent to Distribute and to Distribute Controlled Substances. |

The application is based on these facts:

See attached AFFIDAVIT.

- ☐ Continued on the attached sheet.
- ☐ Delayed notice _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Todd Monfette, Special Agent, ATF
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date:   September 25, 2020
_____
*Judge's signature*

City and state:  Detroit, MI
Hon.Elizabeth A. Stafford   U. S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

IN THE MATTER OF THE SEARCH
OF

**72 Orchard Street, Mount Clemens, MI 48043.**

 (MORE FULLY DESCRIBED IN
ATTACHMENT A)

Case No. 2:18-mc-50629-67

UNDER SEAL

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Todd Monfette, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION & AGENT BACKGROUND**

1.     I make this affidavit from personal knowledge based on my

participation in this investigation, including witness interviews by myself and/or

other law enforcement agents, communications with others who have personal

knowledge of the events and circumstances described herein, and information

gained through my training and experience.  The information outlined below is

provided for the limited purpose of establishing probable cause and does not

contain each and every fact and detail of which I and other law enforcement

officers are aware relating to this investigation.

2.     I am a Special Agent (SA) with the Bureau of Alcohol, Tobacco,

Firearms and Explosives (ATF), United States Department of Justice, and have

been so employed since July of 2017. I have been involved in numerous investigations into the unlawful use and possession of firearms, the possession and distribution of controlled substances, drug related laundering of monetary instruments, and conspiracies associated with criminal firearms offenses. To successfully conduct these investigations, I have utilized a variety of investigative techniques and resources, including the sanctioned deception technique known as undercover, as well as physical and electronic surveillance involving various types of informants and cooperating sources. I have also utilized multiple different social media platforms to include Facebook and Instagram. Through these investigations, my training and experience, and conversations with other agents and law enforcement personnel, I have become familiar with the methods used by traffickers to smuggle and safeguard narcotics, to distribute narcotics, and to collect and launder drug related proceeds. I am also familiar with methods employed by large narcotic organizations, and the sophisticated tactics they routinely use to attempt to thwart an investigation of their narcotics organization by law enforcement.

## EXECUTIVE SUMMARY/PURPOSE OF SEARCH

3.      Since January 2018, the ATF and the United States Attorney's Office (USAO) have been conducting an investigation into a street gang known as the Almighty Vice Lord Nation (AVLN).  This investigation was initiated based on

information gathered through prior ATF and USAO investigations where the AVLN was proven to be heavily involved in violent criminal activity.

4.     Based on these findings, the ATF began reviewing recorded prison calls from incarcerated AVLN members to members of the AVLN on the street – as further discussed below – and despite their sometimes coded nature, the calls revealed that AVLN members are currently involved in drug trafficking, tax fraud, illegal possession of firearms, assaults, robberies, shootings, and murders, all of which are in furtherance and to the benefit of the AVLN.

5.     The ATF is continuing a criminal investigation concerning the Almighty Vice Lord Nation ("AVLN") street gang, including LASAIL HAMILTON, date of birth XX/XX/1992, aka "Sail" and numerous other AVLN members and associates, for suspected violations of 18 U.S.C. § 1962 (RICO and conspiracy); 18 U.S.C. § 924(c) (Use and Carry of Firearm During and in Relation to a Crime of Violence or a Drug Trafficking Crime, and/or Possession of Firearm in Furtherance of a Crime of Violence or a Drug Trafficking Crime); and 18 U.S.C. § 922(g) (Possession of Firearm by a Prohibited Person), (collectively, the "Target Offenses"), among other criminal offenses.

6.     The background of this affidavit will summarize several search warrants conducted on AVLN member's residences in Michigan and discuss the type of evidence recovered. These facts, combined with the details known about

the AVLN enterprise, help to lay the foundation for requesting a search warrant of AVLN member LASAIL HAMILTON's residence located at 72 Orchard Street, Mount Clemens, MI 48043 (hereinafter referred to as the **TARGET PREMISES**). Specific evidence establishing probable cause to search HAMILTON's residence is described herein. The purpose of the search is to obtain relevant communications, images, documents, evidence relating to the trafficking of controlled substances, firearms, and electronic evidence, relating to the AVLN and associated criminal activities. Based upon the facts set forth herein and my training and experience, I submit there is probable cause to search the location described in Attachment A for evidence of these crimes, as described in Attachment B.

## I.    18 U.S.C. § 1962(d) RICO CONSPIRACY

### A. ENTERPRISE EVIDENCE

8.    The Almighty Vice Lord Nation (AVLN) is a long-standing street gang originating in Chicago, Illinois.  The Michigan Chapter of the AVLN is believed to have been active for approximately 40 years.  For example, in 2016, an AVLN leader, who is serving a life sentence in the Michigan Department of Corrections (MDOC) for murder, contacted an AVLN leader on the street and during that recorded prison phone call, the AVLN inmate leader advised that he became a member [of the Vice Lords] on November 12, 1982.

9.     Several law enforcement agencies have investigated and documented the existence and structure of the AVLN and consider it to be one of the most violent criminal enterprises currently operating in the Detroit metropolitan area. The Michigan Chapter of the AVLN is divided into sub-groups known as "branches," including the Unknown Vice Lords (UVL), Conservative Vice Lords, (CVL), Traveling Vice Lords (TVL), Renegade Vice Lords (RVL), Insane Vice Lords (IVL), Mafia Insane Vice Lords (MIVL), Imperial Insane Vice Lords (IIVL), Executioner Insane Vice Lords (EIVL), Cicero Insane Vice Lords (CIVL), and 4 Corner Hustler Vice Lords (4CHVL).  Some of these "branches" also divided into smaller sub-groups known as "decks."  For example the IVL has a deck known as the Insane Goon Gang (IGG).  These branches and decks are expected to assist one another, collaborate with one another on criminal activities, and answer to the gang's leaders in Chicago and Detroit.  For example, on January 13, 2017, ATF served a federal search warrant for the Facebook account belonging to an IVL leader in Michigan.  During that search, the ATF recovered a message to an AVLN leader in Chicago advising his *"undying love"* for the *"tribe of elders"* and thanking that Chicago AVLN leader for letting the IVL leader in Michigan *"have a seat at the royal table."*  I know that "tribe of elders" refers to the original members of the AVLN in Chicago and having a "seat at the royal table" refers to the IVL leader in Michigan being a decision maker along with the original leaders

in Chicago.  Furthermore, on April 20, 2019, during another federal search warrant for a Facebook account belonging to a UVL leader in Michigan, the ATF recovered a message stating *"...I'm the M.O.J. of the Unknown (UVL) in Michigan...I am trying to link up with every M.O.J. of each house so we can get some clarity on how to do this."* I know that "M.O.J" refers to the rank of Minister of Justice and "house" refers to each branch within the AVLN.

10.    The Michigan Chapter of the AVLN has been recognized as a racketeering enterprise in several federal prosecutions in the Eastern District of Michigan that resulted in convictions for RICO, VICAR, and/or weapons offenses, including *United States v. Marvin Nicholson, et al.* (Case No. 2:13-CR-20764), a fourteen defendant case involving the Phantom Outlaw Motorcycle Club and the AVLN; *United States v. Anthony Nixon* (Case No. 2:15-CR-20020); and *United States v. Antonio Clark, et al.* (Case No. 2:15-CR-20472), an eight defendant case involving AVLN members.  Additionally, AVLN leader, Christopher Tibbs, was convicted by a jury in 2014 for aiding and abetting a Hobbs Act robbery (with a criminal street gang enhancement, pursuant to 18 U.S.C. § 521) and the use and carry of a firearm during and in relation to a crime of violence, in connection with an armed robbery committed on behalf of the gang (Case No. 2:14-CR-20154).

## B. EVIDENCE THAT THE AVLN IS STILL OPERATING AS A CRIMINAL ENTERPRISE

6

11.     In the current investigation into the AVLN, the ATF has obtained evidence regarding the nature, scope, structure, and activities of the AVLN, which indicates the organization continues to thrive as a criminal enterprise engaged in conspiracies to commit federal and state criminal offenses (as is further detailed herein).   The ATF has developed this evidence through sources of information (SOI's), physical surveillance, social media outlets, review of historical criminal activities, a consensual T-III, and reviewing of recorded prison phone calls between AVLN members.

12.     During this investigation, ATF agents have gathered information about the AVLN gang, its branches, and its members by reviewing recorded prison phone calls between incarcerated AVLN members and fellow AVLN members on the street.  To date, investigating agents have reviewed more than three thousand (3,000) such prison phone calls. The ATF's review of these calls has revealed numerous calls in which incarcerated AVLN members speak to fellow AVLN members who are outside of prison in order to discuss gang activities, including, but not limited to, verification of gang membership, rank within the gang, and coordination of gang procedures.  For example, on June 7, 2019, during a recorded MDOC prison call, UVL inmate Keith Spann a/k/a "Nation" contacted UVL leader Johnnie Ross Jr aka "Justice" and advised Spann needed a "verification" from Ross.  Spann then put this AVLN-affiliated inmate on the phone to speak with

Ross.  Ross advised he was the *"P"* (Prince) in Michigan and Spann was the

*"Chief Elite"* for the UVL in Detroit.  Ross further advised that Spann's word was

*"golden."*  I know that Spann was new to the MDOC facility in which he was

located and needed the UVL leader on the street to verify Spann's position within

the gang.

13.     During this investigation, ATF agents have also gathered information

about the AVLN gang, its branches, and its members by reviewing prison letters

between AVLN inmates and fellow AVLN members on the street that were

recovered during search warrants or parole checks.  For example, on April 30,

2019, ATF along with other law enforcement served a state search warrant at 1155

W. McNichols Street, Apartment B-1, Highland Park, MI 48203.  The results of

that search revealed countless documents including literature, and letters from

AVLN inmates discussing gang business.  Law enforcement recovered a letter

where an AVLN inmate appeared to be requesting permission to "burn" (assault)

another inmate who was claiming to be a false rank.  Law enforcement then

observed a second letter appearing to be written by the same AVLN inmate

discussing how he did assault that inmate.  Law enforcement requested and

obtained MDOC misconduct paperwork confirming that the victim was in fact

stabbed by the suspected AVLN writer of the prison letters.

14. The investigation has revealed that the organization utilizes defined membership criteria and rules. These rules are commonly referred to by AVLN members as *"literature"* or *"basic 75."* Members must know their "literature," which includes the principles and commandments of the AVLN. The AVLN also has rules requiring attendance at meetings, known as "goals," which is an acronym for "Gathering Of Almighty Lords [G.O.A.L.s]." For example, on February 20, 2019, during a recorded MDOC prison call an IVL inmate was speaking to a UVL leader in Michigan about gang meetings. The UVL leader advised that only *"branch"* and *"reps"* have to attend regular *"goals"* and he (UVL leader) had to attend a *"Universal goal."* I know that "branch" and "reps" refer to the ranks Branch Elite and Representatives within the AVLN and a "Universal goal" refers to a gang meeting where only ranks of Universal Elites are required and able to attend.

15. The AVLN expects its members to pay dues to the gang. On August 12, 2018, during a recorded prison call, AVLN leader Johnnie Ross Jr a/k/a "Lord Justice" advised UVL inmate Keith Spann a/k/a "Nation" that there was a meeting today at 2 p.m., where *"dues"* were being collected. Ross advised another member sent out a group text. Spann advised Ross to tell them to stop that because *"we do not need indictments."* Furthermore, in July of 2019, a federal search warrant was conducted at 9102 Tecumseh, in the City of Redford, Michigan, the known

residence of Johnnie Ross Jr.  During that search AVLN literature was recovered stating *"...Dues are to be paid once a month or however it has been established by your respective precinct.  Refusal to pay dues will result in immediate disciplinary action."*  ATF also recovered a notebook from that same residence containing a log of dues collected from each AVLN member in 2007 and 2008 under the leadership of Ross.  I know this recovery verifies that AVLN members maintain and keep detailed records for many years and additional searches of AVLN affiliated residence could revealed these records.

16.    The AVLN also expects its members to assist fellow gang members in committing crimes and acts of violence, if so ordered.  In September of 2018, an IVL leader through Facebook stated *"What's up with the Bros out there"* to another IVL member in Pontiac, Michigan.  The Pontiac IVL member stated *"...I'm building with ah couple lil niggas tht wanna get dwn but them niggas wild. Shooting in broad daylight wild."*  The IVL leader stated *"Do they want some action. So they like missions."*  The Pontiac IVL member stated *"Yep, thts why I keep em around."*  The IVL leader stated *"Good I might need them soon."*  The Pontiac IVL member stated *"Ok, I'll hit you when I'm off, Mi9hty."*  I know based on the context of the conversation, the terms "missions" and "action" were referring to criminal activity, specifically a shooting for the AVLN.

17.     AVLN members are prohibited from speaking to outsiders about the AVLN and from cooperating with law enforcement authorities.  Engaging in such activity is a "violation," which is punishable by physical injury or death.  Attempts to leave or withdraw from the AVLN oftentimes result in a "beat out," a physical beating by multiple AVLN members, or a "green light," an order to kill.  For example, in 2014, an AVLN leader received a recorded prison call from an AVLN inmate.  That AVLN inmate stated *"I can send you shit where we done killed snitches…for even saying, Oh I'm gonna go to the police, and got their brains blown out."*  Furthermore, in 2016, eight AVLN members pled guilty in the case of *United States v. Antonio Clark, et al.* (Case No. 2:15-CR-20472) to various racketeering charges in connection with the ordered shooting of two AVLN members on May 7, 2015, for attempting to end their affiliation with the TVL branch of the AVLN.  In that shooting, four individuals sustained non-fatal gunshot wounds, to include the two targeted AVLN members.  Furthermore in 2018, ATF interview ATF CI-27016 who advised about a plot to murder a former TVL member who was believed to have cooperated with the government during the *United States v. Antonio Clark, et al.* investigation.  Agents were able to locate corroborating information through MDOC prison call to include one where a TVL inmate stated *"What? That bitch out?...I need to hurry up and get out ASAP…Tell him and…to get together and blow down on dog."*  The TVL associate stated

11

*"...something's gotta happen for real, for real."* The TVL inmate stated *"Hell yeah, his rat ass!"*

18.  The AVLN utilizes "secretaries" to keep track of gang information to include member names, contact information, and rank within the organization. For example, ATF's investigation shows that in 2017 an IVL leader in Michigan is regularly contacted by AVLN-affiliated MDOC prison inmates in recorded prison calls for inmates to provide him with each new member's name and date of birth to the IVL leader's Jpay email. I know that Jpay is an email system utilized by prisoners to communicate with individuals outside of prison. Furthermore, during one recorded prison call, the IVL leader indicated that he wrote down a new member's identifying information in a *"book"* that the AVLN leader had with him. I know based on two (2) separate search warrants (April and July of 2019) conducted at the residences of members of the AVLN that members do keep records on paper or in notebooks with AVLN related documents sometimes dating back several years.

19.  The AVLN also sell illegal narcotics and use firearms to protect these drug sales. Some examples include:

> i.   On February 17, 2017, during a recorded prison phone call, UVL leader Johnnie Ross a/k/a "Lord Justice" and an UVL inmate Keith Spann, a/k/a "Nation," discussed how Spann owned the firearm that

UVL member "RD" (known by agents to be Rishard Collins) possessed when RD was arrested in Spann's van.  Based on the context of the conversation, I believe that Spann used the terms "situation" and "thing" to describe the firearm during the phone call. Upon further investigation, agents determined that Collins was arrested with a Glock pistol and narcotics inside a van registered to Spann.  I know that based on the investigation into the AVLN, Ross, Spann and Collins were all arrested in July 2019, subsequent to a federal grand jury indictment.

ii.   On September 30, 2017, during a recorded prison phone call, an IVL leader advised an IVL inmate that he (IVL leader) gave *"4 bros a half a pound a piece on the cookie tip so Ones, ya know can get it up."* Based on my training and experience, I know that "cookie" is a type of marijuana, and I further believe that this conversation refers to the IVL leader providing four (4) AVLN members with a half-pound of marijuana each.

iii.  On March 8, 2019, a "Goal" as further described above in paragraph 14, was held for the TVL branch at 18519 Sawyer Street in the City of Detroit.  During that meeting, which was recorded by CI-27016 several TVL members discussed obtaining heroin and cocaine from

drug supplier and TVL member Lawon Carter aka *"C-Flame."* Carter advised he charges $900 for a *"zip"* (meaning ounce) of *"hard"* (crack cocaine) and $1200 for *"soft"* (meaning powder cocaine). I know that on September 5, 2019, ATF Agents served two federal search warrants (2:19-mc-51276) at the locations of Algonac and Goddard Streets in the City of Detroit, known to be locations utilized by Carter. Agents recovered several firearms and quantities of cocaine and heroin. Carter is currently under federal indictment in the Eastern District of Michigan.

iv.   On June 3, 2019, during a recorded prison call, between an AVLN inmate and a UVL leader in Michigan law enforcement can overhear a female in the background ask the UVL leader is he still had that *"weed."* The UVL leader stated *"Hell naw, but we fixen to have some moon rock though."* The female asked if it was *"weed."* The UVL leader advised it was *"crazy"* and had *"hash"* and everything in it. The UVL leader further advised it was *"Forty or fifty a g* [gram]. I know that "Moon Rock" is a high potent type of marijuana mixed with additional narcotics.

## C. EVIDENCE THAT THE AVLN IS ENGAGED IN DRUG TRAFFICKING AS A RACKETEERING ACTIVITY

20.     During this investigation, ATF agents have gathered information about the AVLN's interstate network, interstate narcotics trafficking and the use of this interstate network to facilitate their narcotics operation. For example, beginning in 2016, the Drug Enforcement Administration (DEA) conducted an interstate heroin distribution conspiracy investigation related to James Silas a/k/a "Jello", the "Prince" of the AVLN, Mafia Insane Vice Lord (MIVL) branch. Silas was convicted of conspiring to distribute one kilogram or more of heroin. The investigation revealed that Silas was the leader of the MIVLs. As the "Prince" of the MIVLs, Silas used the gang to develop a network of heroin distributors in various cities, including Chattanooga, Knoxville, Memphis, Atlanta and elsewhere. Silas provided his subordinate gang members with what came to be known as "Chicago Gray," a form of heroin that rapidly became highly desired among users. These subordinates sold the heroin to other drug dealers as well as to addicts. Witnesses testified that tens of thousands of dollars at a time were transported from Tennessee to Silas' Illinois residence in payment for heroin (16 CR 00124). In January 2020, ATF Special Agents reviewed documents from the Silas case file, including Silas' cell phone, recovered via Federal search warrant (Eastern District of Tennessee Case Number 1:16-mj-208). Agents observed multiple Detroit-based contacts, including but not limited to, contact information for a high-ranking Detroit AVLN member.

15

21.     During this investigation, ATF agents have gathered information related to Eddie Reid and his ongoing relationship with the AVLN and Chicago, IL members. Since at least 2017, Reid has been "Chief" of the MIVLs and controls the State of Michigan. Reid, similar to Silas, is believed to be involved in an interstate narcotics conspiracy. For example, on August 15, 2018, MIVL member Marcellus Page sent a Facebook message to Reid stating, *"I got some shit I wanna demo wit u on to sane."* Reid stated, *"Indeed you know you can demo wit me on anything."* Page stated, *"Ok tryin to bring some money to the  ⸸ [Mafia]."* Reid stated, *"Indeed because we might need like to take a trip to the chi* [Chicago] *and pick up these few pounds* [referencing pounds of narcotics]*."* Page stated, *"No more need to talk I'm trying to put some in motion I been to low on cash chief time to eat."* Reid stated, *"Truly indeed I'm trying to get this building for the Eastside...Talking is over."* Page stated, *"I need some weight of the flame field big on that...Especially if it can get laid to me...on me."* Reid responded, *"Exactly they been wanting me to come get the shit but I'm not fucking wit greyhound from Chicago dogs already on that shit...And the shit from Cali so definitely needs to get that."* Page stated, *"Well we gotta sit and kick it and come up with a motion Asap...I got some hoes tho...they ready to hit the e way."* Reid stated, *"Cool cause we definitely needs to be down there and I'll call and let the P* [referencing the Prince] *know we coming on a Finance trip."* Page stated, *"If u can get it an lay it*

16

*on me I'm destined to move it sane."* Reid stated, *"Let's try to get it poppin before*

*Sat."* Reid stated, *"Alright bout to make this call now…He said whenever we ready*

*it's on but i got to call him back and see what are answer is ….Hopefully tomorrow*

*or Friday I'm trying to get this shit."*


### D. LASAIL HAMILTON IS A MEMBER OF THE AVLN AND IS ENGAGED IN RACKETEERING ACTIVITIES

22.     In August of 2020, Special Agents reviewed the phone download of

AVLN member Joseph Woodson subsequent a sealed federal search warrant (18-

mc-50629-51). The search warrant results revealed LASAIL HAMILTON is an

active member in the AVLN who communicates with other AVLN members:

   a.   On April 30, 2020, LASAIL HAMILTON received a text message in

        a known AVLN group text stating, "Anybody know if it's some 101s

        on the flo?" LASAIL HAMILTON responded, "My Relative got a

        Glock for 450."  Based upon my training and experience as well as

        discussions with other agents familiar with the AVLN investigation, I

        know that "101" is an AVLN code for a weapon.

   b.   On April 28, 2020, LASAIL HAMILTON received a text message in

        a known AVLN group text stating, "Do any of my brothas no

        anybody that mess with ICE?" A member of the group chat

        responded, "What you want for a sip…zip?" Based upon my training

and experience I know that a "zip" refers to an ounce quantity. Furthermore I know that "Ice" typically refers to the drug crystal methamphetamines.

c. On April 28, 2020, LASAIL HAMILTON received a text message in a known AVLN group text stating, "We just need to have a goal and everybody that's in this group chat needs to be there to stop all this confusion Allah is not the author of confusion." Based on my training, experience and knowledge of the AVLN investigation I know the term goal is referring to an AVLN gang meeting.

d. On April 28, 2020, LASAIL HAMILTON received a text message in a known AVLN group text stating, "And a few of y'all not responding actin like y'all don't see this, y'all need to check in. And for ones that always got excuses and being part partial to the body about to start seeing Vs [short for violation], and if ones don't want to show up for the charges gon get dealt with accordingly."  Based on my training, experience and knowledge of the AVLN investigation, I know that Violations are penalties imposed on members for breaking the rules.

e. On April 27, 2020, LASAIL HAMILTON received a text message in a known AVLN group text stating, "Ain't no 101's [AVLN code for

weapon] otf [on the floor].  Based on my training an experience I

know that "otf" is slang terminology to mean for sale.

f.  On April 25, 2020, LASAIL HAMILTON sent a text to a group text

message consisting of known AVLN members stating, "3132963724

this Sail [HAMILTON] all bro's txt me y'all name so I can lock y'all

in."

23.    In August 2020, I conducted an open source media review of LASAIL

HAMILTON's suspected Facebook account, vanity name "Sail Numbernine"

which revealed the following information:

a.  On August 21, 2020, the status "8844" was posted to the Facebook

account "Sail Numbernie." Based on my knowledge and training, I

believe the numbers 8844 is the numerical representation of "HHDD"

on a touch-tone phone. "HHDD" stands for "Happy Holy Divine

Day," which is observed on Fridays.



b.  On August 18, 2020, a video was posted to the Facebook account

"Sail Numbernine," depicting LASAIL HAMILTON boxing an

19

unknown individual in the back yard of a residence. The video is captioned "How 9$ do" and "only put The Gloves On With My Brothers 9." Based on my knowledge and training, the "9$" stands for "9 Squad" a deck under the IVL branch of the AVLN. The following are screen captures from the above mentioned video:



c. On July 22, 2020, a status was posted to the Facebook account "Sail Numbernine" stating, "I Hate You Fake Gangbangers."



d.  On June 28, 2020, a Facebook live video was posted to the Facebook account "Sail Numbernine" depicting LASAIL HAMILTON in possession of an unknown amount of suspected United States Currency. LASAIL HAMILTON made the following statements during the video, "When you run out of that unemployment come work for me," "All members, I turn up for all 9s members you already know how this shit go. This Lord shit for real though," "That's why I keep a blick next to me close to me because you never know I'm walking around with a lick… A nigga could come up nigga, I'm a come up but you going to die so you going to be coming down if you try me." LASAIL HAMILTON references the money being "dirty" and refers to the money as "dog shit."   Based on my experience and training, I believe "9s" is referencing the Insane Vice Lord branch of the AVLN, "blick" is slang terminology for a firearm, "dog" is slang

terminology for heroin. HAMILTON also references the money being

"dirty," and based on my training and experience, I believe in the

context it refers to the money being made in an illegal manner.

e.   The following is a screen capture from the above mentioned video:



**E. EVIDENCE OF FEDERAL FIREARM VIOLATIONS**

24.     An open source social media search revealed on July 18, 2020, a

video was posted to the Facebook account "Sail Numbernine" depicting LASAIL

HAMILTON in possession of silver and black pistol, an unknown amount of

suspected United States currency while smoking suspected marijuana.



25.    On September 14, 2020, Agents observed the below photograph on the suspected Facebook page of LASAIL HAMILTON with screen name "Sail Numbernine."  The photograph contains a suspected handgun with a date and time stamp of "Sep 14, 2020, P.M. 01:55:04" as observed below.



26.     In August 2020, I conducted an open source media review of LASAIL

HAMILTON's suspected Instagram account, vanity name "9ssailnumbernine"

which revealed the following information:

        a.   On July 27, 2020, a photograph was posted the Instagram

            account "9ssailnumbernine" depicting LASAIL HAMILTON

            displaying suspected gang hand signs in possession of an AR

            style pistol and a silver and black pistol. The silver and black

            pistol is believed to be the same one referenced in paragraph 24.

            The photograph is captioned "Free Cutt."



### F. LASIAL HAMILTON IS ENGAGED IN NARCOTIC TRAFFICKING

27.     On or about September 8, 2020, stories were posted to the Instagram

account "9ssailnumbernine" depicting an unknown amount of suspected marijuana.

The stories are captioned "Tired Off Smoking That Bullshit Come Tap in 9."

Based on my experience and training, I believe the caption is referencing

marijuana for sale.



## II.     BACKGROUND ON VIOLENT GANGS

28.     Based on my training and experience, as well as that of other law
enforcement officers who have participated in this investigation and have training
and experience in the investigation of violent gangs, I know:

  i.   It is common for gang members to possess within their residence
       and/or their cell phones and other electronic devices photographs
       depicting: (a) fellow gang members displaying gang signs, jewelry,
       clothing, and other gang paraphernalia that indicate gang identity
       or affiliation; (b) fellow gang members or associates posing with
       weapons, particularly firearms used for criminal activities; (c)
       fellow gang members or associates posing beside vehicles used

26

during the commission of crimes; and (d) fellow gang members or associates posing at locations that are known to be specific gang hangouts. Gang members often possess these photographs for long periods of time in print or electronically on electronic storage devices (such as USB thumb drives), cell phones, computers, tablets, and other personal electronic devices, as well as via online storage services provided by third-parties, including social media companies, which often automatically maintain the materials in perpetuity.

ii.  Members of the AVLN utilize cellular phones and computers to communicate with each other, to plan specific acts of violence and other crimes, to discuss past criminal activity, to coordinate the sale of illegal narcotics, and to further the objectives of the gang. For example, in July of 2019, during this current investigation, ATF served a federal search warrant at 9102 Tecumseh, Redford, Michigan, which is the known residence of UVL leader Johnnie Ross Jr a/k/a "Lord Justice." During that search ATF recovered the cellular phone belonging to Ross which contained numerous text messages coordinating the sale of illegal narcotics as well as text

threads with other UVL members planning retaliations through acts of violence.

iii. Gang members are often known by street names or aliases used within the gang.  Gang members frequently write, type, and/or electronically store for long periods of time the gang's name, fellow gang members' street names, and sayings and verbiage specific to the gang in or on walls/buildings, furniture, papers, electronic storage devices, cell phones, computers, personal electronic devices, and other miscellaneous items kept within their residences, vehicles, and/or on their person.

iv. Gang members often use social media to: (a) communicate with fellow gang members; (b) communicate with and "disrespect," that is insult, criticize, belittle, and/or challenge, rival gangs; (c) assert power and/or control over a particular territory; (d) boast about criminal activities and/or the proceeds therefrom; (e) assert their role and/or leadership position within the gang; and (f) pay homage to powerful and/or deceased gang members.  When using social media for these purposes, gang members often post photographs and videos of themselves and fellow gang members engaging in gang-related activities, including images and videos displaying

narcotics, currency, and firearms, and wearing certain jewelry or color or clothing brands associated with the gang. Social media accounts are generally accessed by users via computers, tablets, cell phones, and other electronic multimedia devices.

v.   AVLN members also use various multiple social media platforms and networks—to include social media platform applications on their cell phones—to monitor, track, and communicate with other members in furtherance of the AVLN's activities. For example, on August 12, 2017, in a recorded prison phone call, an IVL leader in Michigan advised an AVLN-affiliated inmate that the IVL leader maintains an Instagram and Facebook page and *"kicks that knowledge for em."* I know that "knowledge" is another term utilized for "literature." Furthermore, on July 16, 2019, during a legal search of a parolee's residence, a prison letter was recovered wherein an AVLN inmate and leader advised to go on his *"Facebook and go to my page and send me a friend request, so we can stay connected that way also. Another means for us to communicate on the low."*

vi.   Individuals who sell firearms and narcotics, including gang members, frequently utilize cell phones, computers, tablets, other

29

electronic communication devices, the internet, email, and various social media platforms, to include Facebook, Twitter, Instagram, and Snapchat, among others, to advertise and facilitate the sale and purchase of firearms, narcotics, and illegally obtained goods, among other items.

vii.    Individuals who conspire to commit criminal acts, including gang members, frequently utilize cell phones, computers, tablets, other electronic communication devices, the internet, email, and various social media platforms, to include Facebook, Twitter, Instagram, and Snapchat, among others, to communicate with co-conspirators before, during, and after criminal acts and to record their criminal acts and/or related planning of criminal acts.

viii.   Gang members frequently wear jewelry, chains, clothing, hats, and other gang paraphernalia to identify with a specific gang.  These items are generally kept in their residences, vehicles, and/or on their person and, given the items' value to the gang members, are often retained and not discarded.  Gang members also tattoo gang names, phrases, and symbols as a means of identifying with a specific gang.

ix.   Gang members often use firearms for protection, retaliation, and in furtherance of violent crimes and narcotics distribution.  Gang members will utilize their own firearms, other gang member's firearms, or "common/community" firearms for the aforementioned purposes.  Gang members commonly hide or conceal firearms in houses, vehicles, and/or on their person in an effort to avoid detection by law enforcement.

x.   When an ongoing history of violence between or among two or more gangs exists (i.e., a "gang war"), it is not uncommon for the violent members at the central core of each respective gang to associate with each other and to plan together aggressive acts and/or acts of violent retaliation to be perpetrated by a few members of the violent central cadres. Gang members who use firearms in gang wars will often either retain access to the firearms for protection from retaliation or, to prevent the weapons from being seized by law enforcement during a search of their residence, vehicle, or person, pass the firearms to fellow gang members for safekeeping.

xi.   Individuals who possess firearms often possess other items commonly used or acquired in connection with the possession of

31

firearms.  Some of these items include, but are not limited to: other

firearms, firearm parts, ammunition, firearm receipts, firearms

brochures or owner's manuals, records of sale or acquisition of

firearms, firearms magazines, and holsters.  Firearms are durable

and non-perishable goods, which can be expected to remain in the

individual's possession for extended periods of time. Firearms

possessed by gang members are valuable assets for protecting the

gang's narcotics activity, protecting the members from rival gangs,

and generating income for the gang when used in connection with

carjacking or other robbery offenses.  Because such firearms tend

to be illegally obtained and expensive to purchase on the street,

gang members usually closely protect and maintain them.

## III.   BACKGROUND ON DRUG INVESTIGATIONS

29.   Based on my training and experience, as well as that of other law

enforcement officers who have participated in this investigation and have training

and experience in the investigation of drug trafficking, I know:

    i.   Drug traffickers often take, or cause to be taken, photographs and/or

videos of themselves, their associates in the drug trade, property

derived from the distribution of narcotics (including large quantities of

cash), their drug products, packaging materials, scales, and other drug

paraphernalia, and they often store such photographs and/or videos on their cell phones, computers, and/or post them online on social media platforms, such as Facebook.

ii.   Drug traffickers commonly communicate via cell phone or social media platforms, including Facebook, in order to facilitate drug transactions, and therefore their cell phones and social media accounts often contain records of the contact information of their customers and/or associates in the illegal drug trade.

iii.   Drug traffickers commonly possess firearms and ammunition to protect their illicit drug trade from other drug traffickers and/or suspected criminals who may attempt to steal drugs, drug proceeds and/or assets from a drug trafficker's person or residence.   Because of the illicit nature of selling drugs, drug traffickers are reluctant to report incidents of robbery, breaking and entering, and/or theft, and may attempt to protect themselves and their drugs with firearms.

iv.   Drug traffickers commonly maintain books, records, receipts, notes, ledgers, airline tickets, money orders, passports, and other papers relating to the procurement, distribution, storage, and transportation of controlled substances. These records include the telephone numbers of customers and sources, the amount of controlled substances distributed

33

to various customers, along with running totals of debts owed by those customers. They also maintain paraphernalia utilized to cut and package controlled substances. These aforementioned items are commonly maintained in locations to which drug traffickers have frequent and ready access, i.e. homes, business, and automobiles;

v.   Drug traffickers also commonly store contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residences and/or businesses for ready access and to conceal them from law enforcement authorities.

## IV.   <u>PROBABLE CAUSE AS TO THE PLACE TO BE SEARCHED</u>

### As to 72 Orchard Street, Mount Clemens, MI 48043



30.     In September 2020, I reviewed federal search warrant 18-mc-50629-

33 return related to Facebook account, vanity name "Sail Numbernine"

(HAMILTON) which revealed the following information:

    a.  On April 25, 2019, a user of the Facebook account "Sail

Numbernine" conducted a conversation with a Facebook user

regarding the sale of suspected marijuana. HAMILTON sent

the below photograph depicting suspected marijuana.  The

Facebook user stated "O yeah wassup how much."

HAMILTON stated, "U aint  got enough to buy it all."  The

Facebook user stated, "Man how much."  HAMILTON stated,

"450."  The Facebook user stated, "Ight way."  HAMILTON

stated, "The O."  The Facebook user stated, "Ight give me 30

mins."  HAMILTON stated, "You kappion you kno u bout to

come get a 3.5." Based on my experience, training and

knowledge of the investigation, I believe the "O" is referencing

the **TARGET PREMISES** (72 Orchard Street, Mount

Clemens) and a "3.5" is referencing a quantity of marijuana.



b.  On May 05, 2019, a user of the Facebook account "Sail Numbernine" sent a message to a Facebook user stating "72 Orchard."

c.  On May 27, 2019, a user of the Facebook account "Sail Numbernine" sent a message to a Facebook user stating "Aye I wanna do a snippet to the next video/song at the end of the video....and I ppl meeting at my shit at 1....72 orchard mount Clemens is my address."

d.  On June 7, 2019, a user of the Facebook account "Sail Numbernine" sent messages to a Facebook user stating, "Yep 72 Orchard… That's my address."

31.     In September 2020, I reviewed Federal Search Warrant (18-50629-59) for historical GPS data related to HAMILTON's cellular device. The search warrant results revealed HAMILTON's cellular phone was utilizing cellular telephone towers in the area of the **72 Orchard Street, Mount Clemens, MI**, the **TARGET PREMISES**.

32.     On September 14, 2020, your affiant conducted a query of the Michigan Secretary of State database. The query revealed HAMILTON utilized the **TARGET PREMISES** on his state of Michigan ID, issued on July 08, 2020.

## SURVEILLANCE OF THE TARGET PREMISES

33.     On September 4, 2020, ATF agents conducted surveillance of the **TARGET PREMISES**. The following observations were made:

    a.   At approximately 1300 hours, HAMILTON exited the side door of the **TARGET PREMISES** walked to the end of the driveway, spoke to the driver of blue sedan, and subsequently returned to the front porch of the **TARGET PREMISES**.

    b.   At approximately 1640 hours, HAMILTON arrived at the **TARGET PREMISES** as the passenger in a vehicle. HAMILTON exited the vehicle and entered the side door of the **TARGET PREMISES**.

34.    On September 11, 2020, ATF agents conducted surveillance of the **TARGET PREMISES**. The following observations were made:

   a.   At approximately 1141 hours, HAMILTON walked from the side of the **TARGET PREMISES**, down the driveway and continued walking away from the **TARGET PREMISES**.

35.    I believe based on the above, a search of the **TARGET PREMISES** would reveal communications, including prison letters and electronic communications, containing evidence related to the AVLN, as described in paragraphs 13 and 14 above, the cellular phone and/or electronic devices to include computers or tablets that could have been utilized to conduct these Facebook conversations with AVLN members or other items noted in Attachment B that are indicative of HAMILTON's association with AVLN and other AVLN members.

36.    Based on my training and experience, I know that firearms are durable and non-perishable goods, and once an individual is unable to lawfully purchase a firearm from a Federal Firearms Licensee and obtains a firearm illegally, they tend to maintain possession of that firearm in their residence for an extended period. Also, I know, as stated in paragraphs 19 and 25, drug traffickers often keep firearms in order to protect themselves and their property.  I believe a search of the **TARGET PREMISES** will reveal evidence related to federal firearm violations further described in paragraph 5 above.

38

37.    I reviewed the Computerized Criminal History (CCH) for LASAIL
HAMILTON. The review revealed the following convictions:

- 04.15.2015 – Felony weapons – Firearms – Possession by felon to
  which HAMILTON was found guilty in the 16th Circuit Court,
  Macomb County, Michigan.

- 04.15.2015 – Misdemeanor – Firearm-Discharge with injury or death
  to which HAMILTON was found guilty in the 16th Circuit Court,
  Macomb County, Michigan.

- 06.09.2012 – Felony weapons – Carrying to which Hamilton pled
  guilty in the 16th Circuit Court, Macomb County, Michigan.

- 11.20.2012 – Felony Home invasion to which HAMILTON pled
  guilty in the 16th Circuit Court, Macomb County, Michigan.

- 11.20.2012 – Attempt – Misdemeanor – Police Officer –
  Assault/Resisting/Obstructing to which HAMILTON plead guilty in
  the 16th Circuit Court, Macomb County, Michigan.

- 11.20.2012 – felony stolen property-receiving/concealing - $1000 or
  more but less than $20,000 to which LASAIL HAMILTON pled
  guilty in the 16th Circuit Court, Macomb County, Michigan.

As a result of these felony convictions, HAMILTON is not permitted to possess
firearms or ammunition.

## A. TRAINING AND EXPERIENCE

38.     Based on my training, experience, and knowledge of this investigation, as well as information in this affidavit, I believe there is probable cause to believe that fruits or other evidence of the Target Offenses (listed in paragraph 5 above), will be found at the **TARGET PREMISES.**

## COMPUTERS, CELL PHONES, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

39.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the **TARGET PREMISES**, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive, cell phone, or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

40.     *Probable cause.*  I submit that if a computer, cell phone, or storage medium is found in the **TARGET PREMISES**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

      i.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or

even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

ii.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

iii.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures,

and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

 iv. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

41. *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **TARGET PREMISES** because:

 i. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail

programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

ii.   As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while

executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image

44

files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

iii. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

iv. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While

it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

v.   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

42.   *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or

imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

i.   The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

ii.   Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software

47

available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

iii.   Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

43.   *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

44.   In addition to finding fruits or other evidence of the Target Offenses, I believe a search of the **TARGET PREMISES** will reveal the cellular phones utilized to make the noted criminal postings on social media, and to communicate with others associates of AVLN.  Furthermore, I know based on prior gang

48

investigations that many of these organizations are utilizing smart phones with security codes and/or passcodes, to include "Touch ID" technology.

45.    If a user enables Touch ID on a given device, he or she can register up to 5 fingerprints that can be used to unlock that device.  The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) found at the bottom center of the front of the device.  In my training and experience, users of devices that offer Touch ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

46.    In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode or password must be used instead.  These circumstances include: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days.  Thus, in the event law enforcement encounters a locked device, the opportunity to unlock the device via Touch ID exists only for a short

time.  Touch ID also will not work to unlock the device if (1) the device has been

turned off or restarted; (2) the device has received a remote lock command; and (3)

five unsuccessful attempts to unlock the device via Touch ID are made.

47.     The passcode or password that would unlock a device with Touch ID

is not known to law enforcement.  Thus, it will likely be necessary to press the

finger(s) of the user of such recovered devices to its Touch ID sensor in an attempt

to unlock the device for the purpose of executing the search authorized by this

warrant.  Attempting to unlock the relevant device(s) via Touch ID with the use of

the fingerprints of the user is necessary because the government may not otherwise

be able to access the data contained on those devices for the purpose of executing

the search authorized by this warrant.

48.     In my training and experience, the person who is in possession of a

device or has the device among his or her belongings at the time the device is

found is likely a user of the device.  However, in my training and experience, that

person may not be the only user of the device whose fingerprints are among those

that will unlock the device via Touch ID, and it is also possible that the person in

whose possession the device is found is not actually a user of that device at all.

Furthermore, in my training and experience, I know that in some cases it may not

be possible to know with certainty who is the user of a given device, such as if the

device is found in a common area of a premises without any identifying

information on the exterior of the device.  Thus, it will likely be necessary for law enforcement to have the ability to require any occupant of the Subject Premises to press their finger(s) against the Touch ID sensor of the locked device(s) found during the search of the Subject Premises in order to attempt to identify the device's user and unlock the device(s) via Touch ID.

49.     Although I do not know which of a given user's 10 fingerprints is capable of unlocking a particular device, based on my training and experience I know that it is common for a user to unlock a Touch ID-enabled device via the fingerprints on thumbs or index fingers.  In the event that law enforcement is unable to unlock such devices as described above within the five attempts permitted by Touch ID, this will simply result in the device requiring the entry of a password or passcode before it can be unlocked.

50.     Due to the foregoing, I request that the Court authorize law enforcement to press the fingers (including thumbs) of individuals found at the Subject Premises to the Touch ID sensor of any such devices for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by this warrant.

51.     Recently, some smart phones have offered a feature for unlocking a device via facial recognition, in much the same way as Touch ID.  Thus, I also request that the Court authorize law enforcement to hold the device in front of the

targets face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.

## CONCLUSION

52.     Based on my training, experience, and the facts contained in this affidavit, there is probable cause to believe that this search would lead to the discovery of fruits or other evidence that would tend to establish violations of federal criminal laws, including RICO conspiracy, illegal selling and possession of firearms, and conspiracy to do the same, and that such a search will result in the seizure of items of evidentiary value in this investigation as described above.

## REQUEST TO SEAL DOCUMENTS

53.     Due to the ongoing nature of this investigation, I respectfully request that all documents related to this application for search warrants be sealed until further order of the Court.  This investigation is of a sensitive nature, and any disclosure of the fact of this search warrant, or the facts contained in this affidavit, could jeopardize the investigation and potentially place certain confidential sources and cooperating witnesses at risk.

Respectfully submitted,

Todd Monfette, Special Agent
Bureau of Alcohol, Tobacco, Firearms
and Explosives

Sworn to before me and signed in my
presence and/or by reliable electronic means.

ELIZABETH A. STAFFORD
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF MICHIGAN

September 25, 2020

53

**Attachment A**

**72 Orchard Street, Mount Clemens, Michigan 48043**

The residence is described as an attached single family split level residence.  The outside of the residence is constructed of red brick, white siding and a black roof. . The numbers "72" are affixed to the right of the front door.  The search includes the vehicles on the property or curtilage of the residence.

The residence is located on the south side of Orchard Street in between Clemens and Euclid Streets.



**ATTACHMENT B**

**PARTICULAR ITEMS TO BE SEIZED**

The items to be seized include any evidence, item, document, or records, or items

containing such, relating to violations of Title 18, United States Code, Sections

922(g), 924(c), and 1962, and Title 21, United States Code, Sections 841 and 846,

including the following:

1. Firearms, firearm parts, ammunition, firearm receipts, firearms brochures or owner's manuals, records of sale or acquisition of firearms, firearms magazines, and holsters;

2. Any criminal enterprise paraphernalia, including clothing, posters, signs, jewelry, CD's, DVD's, writings, printed material, or photographs that depict the Almighty Vice Lord Nation displaying symbols, hand signs, colors, paraphernalia, related to the criminal enterprise;

3. Any digital media including cell phones, digital cameras, computers, compact discs and flash drives that could contain videos, photographs and communications, and the contents therein;

4. Any newspaper clippings that may contain articles related to criminal activity or obituaries of deceased members of the criminal enterprise;

5. Items of identification and papers, documents and affects which establish dominion and control of premises, including, but not limited to, driver's license, keys, mail, envelopes, receipts for rent, bills from public utilities, photos, address books and similar items;

6. Any paintings, drawings, photographs or photograph albums depicting persons, vehicles, weapons, or locations which may appear upon observation to be relevant on the question of gang membership or association, or which

may depict items sought and/or believed to be evidence in the case being investigated with this warrant, or which may depict evidence of any criminal activity.

7. Records and information relating to communications between members of the Almighty Vice Lord Nation, in all their forms, such as U.S. Mail, voicemails, and electronic messages of any kind (such as text messages, social media messages, emails, and other forms of electronic communication)

## ELECTRONICALLY STORED INFORMATION

The above identified information and/or data may be stored in the form of magnetic or electronic coding on computer media, or on media capable of being read by a computer or with the aid of a computer related equipment.  This media includes but is not limited to any magnetic or electronic storage device such as floppy diskettes, hard disks, backup tapes, CD-ROMs, optical discs, printer buffers, smart cards, memory calculators, electronic notebooks, cellular telephones, Smartphones (e.g., iPhone), or mobile media players (e.g., iPods).  In searching for data capable of being read, stored or interpreted by a computer, law enforcement personnel executing this search warrant will employ the following procedure:

   a.   Upon securing the premises, law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will make an initial review of any computer equipment and storage devices to determine whether or not these items can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve the data.

   b. If the computer equipment and storage devices cannot be searched on-site in a reasonable amount of time and without jeopardizing the preservation of the data, then the computer personnel will determine whether it is practical to copy/image the data.

   c. If the computer personnel determine it is not practical to perform an on-site searching, copying or imaging (due to time, technical or other considerations), then the computer equipment and storage devices will be

seized and transported to an appropriate law enforcement laboratory for review. The computer equipment and storage devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

d. Any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offense, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) any data that falls within the list of items to be seized set forth within.

e. In searching the data, computer personnel may examine all of the data contained in the computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein.

f. If the computer personnel determine that the computer equipment and storage devices are no longer necessary to retrieve and preserve the data, and the items are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(b), the government will return these items within a reasonable period of time.

g. In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

- Any computer equipment and storage devices capable of being used to commit or store evidence of the offenses listed above;

- Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including but not limited to word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

- Any magnetic, electric or optical storage device capable of storing data such as floppy disks, hard disk tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, USB flash memory devices,

personal digital assistants, mobile telephones or answering machines;

- Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices, or software;

- Any applications, utility programs, compliers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

- Any physical keys, encryption devices and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

- Any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, storage devices or data.

h. During the execution of this search warrant, law enforcement is permitted to: (1) depress the thumb – and/or fingers onto the fingerprint sensor of the digital device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the targets face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device. In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in *Graham v. Connor*, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

AO93 (Rev. 11/13) Search and Seizure Warrant | Special Agent: | Todd Monfette, ATF | Telephone: (313) 600-1240

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Michigan

In the Matter of the Search of        )
*(Briefly describe the property to be searched*  )
*or identify the person by name and address)*  )    Case No.  18-50629-67
)
72 Orchard Street, Mount Clemens, MI 48043  )
(More details in Attachment A)        )
)

## SEARCH AND SEIZURE WARRANT

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ Michigan _____ .
*(identify the person or describe the property to be searched and give its location):*

See ATTACHMENT A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized):*

See ATTACHMENT B.

**YOU ARE COMMANDED** to execute this warrant on or before  10/8/2020        *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to  the presiding United States Magistrate Judge on duty  .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for ____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    September 25, 2020   10:30 am      *Elizabeth A. Stafford*
                                            *Judge's signature*

City and state:    Detroit, MI                 Hon.Elizabeth A. Stafford  U. S. Magistrate Judge
                                              *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>18-50629-67 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____                      _____
                                                                         *Executing officer's signature*

                                                                         _____
                                                                         *Printed name and title*